UNITED STATES of America,
Plaintiff–Appellee,

v.

Paul Charleston GREGORY,
Defendant–Appellant.

No. 95–4005.

United States Court of Appeals,
Tenth Circuit.

March 18, 1996.

Larry E. Reed of Hassan & Reed, Minneapolis, Minnesota (Hakeem Ishola of Yengich, Rich & Xaiz, Salt Lake City, Utah, with him on the brief) for Defendant–Appellant.

David J. Schwendiman, Assistant United States Attorney, Salt Lake City, Utah (Scott Matheson, Jr., United States Attorney, and Bruce C. Lubeck, Assistant United States Attorney, on the brief) for Plaintiff–Appellee.

Before EBEL, Circuit Judge, McKAY, Senior Circuit Judge, and COOK, Senior District Judge.*

H. DALE COOK, Senior District Judge.

I.

The defendant, Paul Charleston Gregory, brings this appeal seeking review of the district court's order denying the defendant's motion to suppress evidence seized during a traffic stop. Our review concerns whether the stop and search of the defendant and his vehicle was illegal in view of our recent decision in *United States v. Botero–Ospina,* 71 F.3d 783 (10th Cir.1995) (en banc). We have jurisdiction pursuant to 28 U.S.C. § 1294(1), and reverse.

On July 21, 1993, at approximately 6:00 p.m., Officer Phil Barney of the Sevier County Sheriff's Office was patrolling Interstate 70 between Salina and Green River, Utah.[1] At this location, the terrain is mountainous and high desert. The roadway is winding. The weather conditions on that date were clear and windy. While in pursuit of a van going seven miles over the speed limit, Officer Barney passed a U-haul rental truck headed in the same direction which was being driven by the defendant, a black male. As the officer passed, he looked in his rear view mirror and saw defendant's U-haul truck cross two feet into the right shoulder

---

* The Honorable H. Dale Cook, Senior Judge for the United States District Court for the Northern, Eastern and Western Districts of Oklahoma, sitting by designation.

1. Interstate 70 is a four lane highway, with two lanes eastbound and two lanes running west.

emergency lane of the interstate. The incident was a single occurrence. The emergency lane measures approximately fourteen feet wide. The officer testified that crossing into the emergency lane of a roadway is a violation of Utah law.[2] The officer testified that such conduct could also be indicative of a sleepy or intoxicated driver. The officer said he decided to stop the vehicle because of the traffic violation and to see if the driver was awake but that he did not intend to conduct a DUI investigation. The officer immediately abandoned his pursuit of the speeding van, pulled over and waited for the U-ha. truck to pass, then pulled out and pursued defendant's vehicle. Officer Barney turned on his overhead lights which activated a video camera. He did not indicate that he observed any further driving irregularities as he pursued and pulled over the driver of the U-haul truck.

Officer Barney approached the driver's side of the vehicle and asked the driver, defendant Paul Charleston Gregory, for his driver's license and rental agreement. The items were produced. The license was issued by the State of Minnesota and the U-haul rental agreement was in defendant's name. The rental agreement showed that the defendant had paid $1,700 cash to rent the truck. The officer inquired where the defendant was going and the defendant said St. Paul, and referred to it as his home. After initially obtaining defendant's driver's license, Officer Barney did nothing to determine whether the defendant was impaired, except to ask the defendant if he was "awake." The defendant responded that he was and inquired why he had been pulled over. The officer indicated through gesturing that the defendant had crossed over into the emergency lane. The defendant explained that the weave probably occurred when he was pouring a cup of coffee. On cross examination the officer admitted that there was no indication that the defendant

was impaired from alcohol, and he appeared alert. The officer also admitted observing that the defendant was holding a cup, which he assumed contained coffee, and responded, "Good enough." The defendant was not cited for a traffic violation and no road sobriety test was conducted by the officer.

At this point the evidence is conflicting. Officer Barney testified that he returned the license and rental agreement to the defendant prior to casually inquiring as to the origin and the purpose of defendant's travels. The defendant said that he was coming from the Los Angeles area and was moving his sister's furniture to St. Paul. He stated that his sister and brother-in-law were traveling to St. Paul by bus.

Officer Barney testified that he became suspicious that the defendant was hauling something illegal. The officer testified that he arrived at this conclusion because every time he asked the defendant a question, the defendant "would swallow before he answered." He was also suspicious because of "the amount of the rental" and because the owners of the furniture "had taken another way of transportation" rather than joining the defendant in the truck. Based on these concerns, Officer Barney testified that he asked the defendant if he was carrying any illegal substances in the truck. The defendant said no. The officer asked if he could take a look in the truck. The defendant indicated that he could and got out of his truck, walked to the back and raised the sliding rear door as far as defendant could reach. The officer testified that he had a clear view of the contents which consisted of an assortment of old "junky" furniture that had a "stench of dirty, musty, unkempt, trash." The view revealed furniture, appliances and other items which were put carelessly in the truck without being secured. The officer, still curious about the contents of the truck, then stepped onto the bed and leaned inside for a closer look. The officer

---

**2.** The statute relied upon in finding a violation of state law by the magistrate and subsequently adopted by the district court, is Utah Code Ann. § 41–6–61(1) (1988), which provides:

On a roadway divided into two or more clearly marked lanes for traffic the following provisions apply:

(1) A vehicle shall be operated as nearly as practical entirely within a single lane and may not be moved from the lane until the operator has determined the movement can be made safely.

testified that at that point he thought he could faintly detect the smell of marijuana, although "the other stench was more powerful." The·officer stepped out of the truck, patted down the defendant and asked the defendant to again produce his driver's license. Without explanation, the officer returned to the patrol vehicle to run a license check and to request assistance from a back-up unit. Officer Barney estimated that one minute and twenty seconds had lapsed from the moment he pulled the defendant over to the side of the road until the time he requested the defendant to open the rear door of the U-haul truck.

While waiting for back-up assistance, Officer Barney stepped back into the truck, and moved two cardboard boxes which were dusty and "didn't appear to had been opened in a long, long time." The officer asked if he could look inside, and the defendant indicated that he could. Finding nothing unusual, Officer Barney waited for the arrival of another officer before continuing his search. When the second officer arrived, Officer Barney asked him to watch the defendant, and he climbed back into the truck and searched its contents. The defendant remained under the supervision of the second officer and was silent and calm during the search of the truck. Officer Barney found marijuana and approximately 10 kilograms of cocaine concealed in various plastic garbage bags, wrapped in clothing. The defendant was then handcuffed and placed under arrest.

The defendant's version of the facts slightly vary from that of the officer. Defendant testified that upon approaching him, the officer requested that he produce his license and rental agreement. Defendant stated that while examining the documents, the officer continued to question the defendant regarding his place of origin, destination, purpose of travel and the truck's contents. After defendant responded that he was hauling furniture, the officer asked the defendant if he could take a look in the truck and motioned him to get out of the cab. The defendant contends that the officer did not return his license and rental agreement to him until after he was out of the truck and had agreed to show the officer the truck's contents.

## II.

In reviewing the denial of a motion to suppress evidence, we accept the factual findings of the district court and determination of credibility unless they are clearly erroneous. *United States v. Flores*, 48 F.3d 467 (10th Cir.) *cert. denied*, —— U.S. ——, 116 S.Ct. 122, 133 L.Ed.2d 72 (1995). We view the evidence in the light most favorable to the district court's finding and review de novo the ultimate determination of reasonableness under the Fourth Amendment. *United States v. Little*, · 18 F.3d 1499, 1503 (10th Cir.1994) (en banc).

## III.

Stopping an automobile and detaining its occupants constitutes a seizure within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief. *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–96, 59 L.Ed.2d 660 (1979). The reasonableness of the stop is evaluated under a two prong test set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), by asking first, "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 20, 88 S.Ct. at 1879.

Under *Terry*, a law enforcement officer is permitted to make a limited "seizure" of an individual suspected of criminal activity if the officer has "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id.* at 21, 88 S.Ct. at 1880.[3] This determination is controlled by

---

**3.** In finding the stop lawful, the district court relied upon our decision in *United States v. Guzman*, 864 F.2d 1512 (10th Cir.1988). In *Guzman* we held that the proper standard for determining whether a traffic stop is unconstitutionally pretextual is whether "under the circumstances, a reasonable officer would have made the stop in the absence of the invalid purpose." *Id.* at 1517 (quoting *United States v. Smith*, 799 F.2d 704, 709 (11th Cir.1986). *Guzman* has since been

our recent decision in *United States v. Botero–Ospina.* Under *Botero–Ospina,* "[o]ur sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* at 787.

The magistrate, whose report was subsequently adopted by the district court, found that when the defendant's truck briefly crossed into the right shoulder emergency lane, he violated a Utah statute requiring that a vehicle be operated "as nearly as practical entirely within a single lane ..." Utah Code Ann. § 41–6–61(1). Additionally the magistrate found that this isolated incident of crossing over to the shoulder gave rise to a reasonable suspicion that the defendant's driving was impaired by alcohol or lack of sleep. We disagree.

■ We do not find that an isolated incident of a vehicle crossing into the emergency lane of a roadway is a violation of Utah law. This interpretation of Utah law has been followed by the Utah courts. *See e.g., State of Utah v. Bello,* 871 P.2d 584, 586 (Utah App.1994) (a single instance of weaving does not constitute a violation of Utah Code Ann. § 41–6–61(1)). We agree with the Utah court which noted that the statute requires only that the vehicle remain entirely in a single lane "as nearly as practical." *Id.* The road was winding, the terrain mountainous and the weather condition was windy. Under these conditions any vehicle could be subject to an isolated incident of moving into the right shoulder of the roadway, without giving rise to a suspicion of criminal activity. The driver may have decided to pull over to check his vehicle and then have a sudden change of mind and pulled back into the traffic lane. Since the movement of the vehicle occurred toward the right shoulder, other traffic was in no danger of collision. These facts lead us to conclude that the single occurrence of moving to the right shoulder of the roadway which was observed by Officer Barney could not constitute a violation of Utah law and therefore does not warrant the invasion of Fourth Amendment protection.

overruled by our decision in *United States v.*

■ The alternative premise relied upon by the magistrate and district court to justify the stop of defendant's vehicle is Officer Barney's purported reasonable suspicion that the defendant was impaired by alcohol or lack of sleep. In *Botero–Ospina,* we decided that straddling the *center* lane marker of an interstate could constitute an adequate basis to investigate for impairment of the driver due to sleepiness or intoxication. *See also, United States v. Lee,* 73 F.3d 1034 (10th Cir.1996). Driving under the influence of alcohol is a violation of Utah law. Utah Code Ann. § 41–6–44. However, Officer Barney testified that he did not intend to stop the defendant to conduct a DUI investigation and in fact, he did not administer a road sobriety test after stopping the defendant. Thus, prior to stopping the vehicle, Officer Barney must have been satisfied that the vehicle's isolated movement into the right shoulder did not give rise to a reasonable suspicion that the driver was intoxicated.

Officer Barney testified that over 80 percent of the serious vehicle accidents in this area were caused by drivers who fall asleep at the wheel. Utah courts have held that a vehicle may be stopped in the interest of public safety where there is reason to believe that there may be imminent danger to life or limb based on an objective standard. *Provo City v. Warden,* 844 P.2d 360 (Utah App. 1992). However, driving while fatigued is not criminal activity and only if a driver is extremely fatigued can the condition constitute a danger to public safety. Officer Barney did not testify to any factors which would support a reasonable suspicion that the defendant's driving constituted a threat of injury to himself or others. Officer Barney testified that after initially passing defendant's U-haul truck, he looked back and noticed that the vehicle moved to the right shoulder. There is no testimony that Officer Barney saw the defendant nod his head or show any signs of sleepiness. As we have stated, "[I]f failure to follow a perfect vector down the highway or keeping one's eyes on the road were sufficient reasons to suspect a person of driving while impaired, a substantial portion of the public would be subject each day to an

*Botero–Ospina,* 71 F.3d at 785.

invasion of their privacy." *United States v. Lyons,* 7 F.3d 973, 976 (10th Cir.1993). We take issue with the district court's conclusion that Officer Barney's initial stop of defendant's vehicle was based on a reasonable suspicion that the defendant had violated a traffic or equipment regulation sufficient to justify the stop. We do not believe that Officer Barney had sufficient grounds to stop defendant's vehicle. The totality of the circumstances suggests that the stop did not meet the reasonableness test of the Fourth Amendment which "protects the 'security of one's privacy against arbitrary intrusion by the police'". *Schneckloth v. Bustamonte,* 412 U.S. 218, 242, 93 S.Ct. 2041, 2055, 36 L.Ed.2d 854 (1973), (*citing, Wolf v. Colorado,* 338 U.S. 25, 27, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782 (1949)).

■ Defendant also challenges the magistrate's finding that the search of his vehicle was valid because Officer Barney obtained his consent. We have held "that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him." *United States v. Gonzalez–Lerma,* 14 F.3d 1479, 1483 (10th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994).

The defendant's and the officer's version of events vary pertaining to the timing of the officer's return of defendant's driver's license and his request to look inside defendant's truck. The magistrate weighed credibility in favor of the government by finding that it was reasonable to assume that the officer returned the license to the defendant simultaneously with his statement "good enough." We cannot conclude that the findings of the magistrate are clearly erroneous.

■ However, while returning a driver's documents is *necessary* to show that the police-citizen encounter was consensual, it may not always be sufficient. *See, United States v. McSwain,* 29 F.3d 558, 563 (10th Cir.1994) and *United States v. Soto,* 988 F.2d 1548, 1557 n. 5 (10th Cir.1993). Although not prerequisites, in determining whether consent is voluntary when given following the return of defendant's documents, we look at such factors as whether the officer informed the defendant that he was free to leave the scene or that he could refuse to give consent. *McSwain,* 29 F.3d at 563.

■ Even though voluntary consent may be given by a person who is detained, *United States v. Flores,* 48 F.3d at 469, if the consent is given after an illegal stop, the government carries a heavy burden of showing that the primary taint of the illegal stop was purged so that the subsequent consent was voluntary in fact. *United States v. Fernandez,* 18 F.3d 874, 881 (10th Cir.1994). To satisfy this burden the government must prove, from the totality of the circumstances, a sufficient attenuation or "break in the causal connection between the illegal detention and the consent." *McSwain,* 29 F.3d at 562 n. 2. When examining the totality of the circumstances, no single fact is dispositive although the three factors set forth in *Brown v. Illinois,* are especially significant: "the temporal proximity of the illegal stop and consent, any intervening circumstances, and purpose and flagrancy of [the official] misconduct." *Fernandez,* 18 F.3d at 882 (*citing, Brown v. Illinois,* 422 U.S. 590, 603–04, 95 S.Ct. 2254, 2261–62, 45 L.Ed.2d 416 (1975)).

■ During a routine traffic stop, the detaining officer may request a driver's license and other vehicle documents, run a computer check on the car and driver, and issue a citation. *Soto,* 988 F.2d at 1554. If the driver produces a valid license and proof of right to operate the vehicle, the officer must permit the driver to continue on his way without delay for further questioning. *Id.* (quoting *United States v. Pena,* 920 F.2d 1509, 1514 (10th Cir.1990), *cert. denied,* 501 U.S. 1207, 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991)).

Even though Officer Barney returned defendant's license, the return of the license was in close temporal proximity, if not simultaneous with, Officer Barney's inquiry whether he could look inside the defendant's truck and his directive that the defendant get out of the truck. In examining the first factor in *Brown,* we note that Officer Barney's request to search defendant's truck came less than 35 seconds after the defendant was given back his license and registration. We have repeatedly held that consent is not voluntary

when in such close temporal proximity to an illegal stop. *See, e.g., McSwain,* 29 F.3d at 563 (consent not voluntary when obtained "only a few minutes" after the illegal seizure); *United States v. Fernandez,* 18 F.3d at 883 ("only moments" elapsed between illegal detention and seizure); *United States v. Maez,* 872 F.2d 1444, 1455 (10th Cir.1989) (taint of illegal seizure not purged when consent form signed 45 minutes later).

 In applying the second factor in *Brown,* we look only from the defendant's perspective in determining whether any intervening event occurred which isolates the defendant from the coercive effects of the original illegal stop so as to render his subsequent consent voluntary in fact. For consent obtained subsequent to an illegal detention to be voluntary in fact, there must be proof of facts or events which ensure that the consent provided by the defendant is truly voluntary and not the fruit of the illegal stop. The facts or events must create a discontinuity between the illegal stop and the consent such that the original illegality is weakened and attenuated. *See, e.g. Johnson v. Louisiana,* 406 U.S. 356, 365, 92 S.Ct. 1620, 1626, 32 L.Ed.2d 152 (1972) (taint of illegal seizure purged by presence of counsel and appearance before the magistrate); *United States v. Recalde,* 761 F.2d 1448, 1458–59 (10th Cir. 1985) (issuing *Miranda* warnings, telling defendant he is free to leave, and advising defendant of right to refuse consent are all factors that may "satisfy the requirement of intervening circumstances."). We find a lack of attenuation sufficient to make defendant's subsequent consent voluntary. There were absolutely no intervening circumstances in the short period of time between the illegal detention and the defendant's subsequent consent.

Finally, we find no legal justification for the officer's continued detention of the defendant sufficient to satisfy the third factor in *Brown.* The video recording of the stop shows that Officer Barney had little interest in whether the defendant was awake at the wheel. Officer Barney's interest was in the contents of the truck and acquiring entrance to the contents. At all times, the defendant appeared relaxed and responded calmly to

each of the officer's inquiries. After the officer's comment, "Good enough", and his return of defendant's license and registration, the only purpose for the officer to continue to detain the defendant was to embark upon an improper "fishing expedition in the hope that something might turn up." *See, McSwain,* 29 F.3d at 563 (citing *Brown,* 422 U.S. at 605, 95 S.Ct. at 2262–63). Considering the totality of the circumstances, we conclude that Officer Barney's stop of defendant's vehicle was illegal and the subsequent search of his vehicle was tainted. The evidence seized should have been suppressed.

The judgment of the district court is **REVERSED.** The case is **REMANDED** for further proceedings.